**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **LONNIE KADE WELSH,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **A-23-CV-00969-RP** |
| | § | |
| **MARSHA MCLANE, et al.,** | § | |
| **Defendants.** | § | |

**ORDER**

Before the Court are Plaintiff Lonnie Kade Welsh's Fourth Amended Complaint and Supplemental Complaint (ECF Nos. 47, 92); Defendants' Motion for Summary Judgment, Plaintiff's Responses thereto, and Defendants' Reply (ECF Nos. 103, 114-15, 117, 120-21, 124); Plaintiff's Motion for Additional Discovery (ECF No. 107); and Plaintiff's Motion for the Appointment of Expert to Assist the Court (ECF No. 122). Upon review of the parties' pleadings, the Court grants in part and denies in part Defendants' motion for summary judgment and denies Plaintiff's pending motions.

**I. BACKGROUND**

Plaintiff has been civilly committed as a sexually violent predator (SVP) since 2015. *See In re Commitment of Lonnie Kade Welsh*, No. 09-15-00498-CV, 2016 WL 4483165 (Tex. App.--Beaumont 2016). He is in the custody of the Texas Civil Commitment Office (TCCO) and currently resides at the Texas Civil Commitment Center (TCCC) in Littlefield, Texas. He names the following Defendants in his Fourth Amended Complaint: Marsha McLane, Executive Director of TCCO, in her official and individual capacity; Chris Greenwalt, TCCO Case Manager, in her individual capacity; Lisa Peralta, TCCO Case Manager, in her individual capacity; Kara Gougler, TCCO Administrator, in her official and individual capacity; Rachel Heredia, TCCO Case

Manager, in her individual capacity; Jessica Marsh, TCCO Assistant Director, in her individual capacity; and the TCCO, with Defendants Chris Greenwalt, Rachel Heredia, and John Clum as agents, for Plaintiff's claims under the Texas Tort Claims Act (TTCA).

In his fourth amended complaint, Plaintiff alleges that, pursuant to Defendant McLane's policies, TCCC staff took several items of personal property from him without any due process, including his PlayStation 3, video games, a television, an MP3 player, and a radio, which he claims violates his constitutional right to due process as well as the Fifth Amendment's Takings Clause. He alleges that, pursuant to McLane's disciplinary policy, TCCC staff placed him in solitary confinement, i.e., the Secure Management Unit (SMU), without first giving him an opportunity to defend himself by calling or questioning witnesses, reviewing the evidence against him, or even, in some cases, personally attending the disciplinary hearings. He alleges McLane failed to train TCCC staff in the use of the mechanical and chemical restraints they have used against him. Plaintiff states TCCC staff force him to wear a GPS monitor, which he considers a badge of slavery and servitude, and which violates his rights to substantive due process and equal protection. He further alleges Defendants Greenwalt, Clum, and Heredia negligently installed the GPS monitors, creating a cause of action under the TTCA and that, in 2020, Defendant Greenwalt failed to protect him when she stood by while TCCC security staff harassed and assaulted him.

Plaintiff alleges that, due to McLane's restrictive policies, he has less freedom at TCCC than prisoners have at the Texas Department of Criminal Justice (TDCJ), and that the excessive discipline, mechanical and chemical restraints, use of solitary confinement, and restrictions on personal property result in his confinement being unconstitutionally punitive. He states McLane violated his substantive and procedural due process rights by putting him in mechanical restraints

and placing him in solitary confinement without first seeking professional medical judgment. He alleges McLane's policies have worsened his mental health problems.

Plaintiff alleges Greenwalt excessively punished him by placing him in solitary confinement without any due process from March 2022 to March 2023, July 2023 to December 2023, and April 2024 to September 2024 and that she also restricted his property for a year. Plaintiff states Greenwalt and Peralta were deliberately indifferent to his medical needs when they refused to change his GPS monitor even though it caused him to bleed and be in pain. Plaintiff alleges that, pursuant to McLane's policy and instruction, Peralta violated his procedural due process by placing him in a lower treatment tier with more restrictive housing on July 1, 2023, and again on April 11, 2024. He alleges McLane ordered Peralta, Gougler, and Greenwalt to target him for increased punishment compared to other TCCC clients.

Plaintiff alleges McLane and Peralta retaliated against him for his political speech when they removed his mother, Patsy Lonnell Hanks, from his contact list from July to December 2023, and again from May 2024 to the present day. He further alleges he was retaliated against for posting bail in July 2023 when Peralta and Greenwalt barred him from communicating with three other family members.

Plaintiff alleges McLane and Marsh denied him sex offender therapy from March 2022 until December 2023, and again in April 2024 until September 2024. He alleges McLane punished him while he was in solitary confinement by denying him medical care for his bilateral neuropathy. Plaintiff states TCCC staff pat search him upwards of twenty times a day, and McLane provides him with Tier 2 treatment but not Tier 2 privileges. He alleges McLane does not permit him to wear certain clothing while he is in solitary confinement and bars him from attending all Christian religious services, violating the Religious Land Use and Institutionalized Persons Act (RLUIPA).

He further alleges McLane and Marsh have violated the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA) by failing to accommodate his severe mental health disorders, e.g., bipolar disorder, anxiety disorder, and multiple personality disorder. He seeks compensatory, punitive, and nominal damages, as well as declaratory and injunctive relief. (ECF Nos. 47, 92.)

In response to Plaintiff's Fourth Amended Complaint, Defendants McLane and Marsh filed a motion to partially dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1). (ECF No. 50). On August 12, 2025, the Court granted Defendants' motion as it related to Plaintiff's claims for monetary damages against McLane in her official capacity and denied Defendants' motion in all other respects. (ECF No. 96.)

Thereafter, Defendants filed a motion for summary judgment, wherein they argue the following: (1) Plaintiff's claims for damages based on Defendants' official capacity are barred by the Eleventh Amendment; (2) Plaintiff's claims for injunctive relief based on Defendants' official capacity are barred by *Ex parte Young* because Defendants lack the authority and duty to enforce the policies and conditions of which Plaintiff complains;[1] (3) Plaintiff fails to allege Defendant Clum's personal involvement in any alleged constitutional violations; (4) Plaintiff is improperly re-litigating facts from other federal and state lawsuits; (5) Plaintiff fails to state either a constitutional or state-law claim regarding his GPS ankle monitor; (6) Plaintiff fails to state a claim for failure to train regarding the use of mechanical or chemical restraints; (7) Plaintiff fails to state a claim against Defendant Greenwalt for bystander liability; (8) Plaintiff fails to show his housing assignment has substantially burdened his religious practice in violation of RLUIPA; (9) Plaintiff fails to show Defendants retaliated against him in violation of his First Amendment right to free speech; (10) Plaintiff fails to show his procedural and substantive due process rights were violated;

[1] The Court addressed this argument in its order on Defendants' motion to dismiss and will not address it again in this order.

(11) Plaintiff fails to show his conditions of confinement violate the Eighth Amendment; (12) Plaintiff fails to show McLane was deliberately indifferent to his serious medical needs; (13) Plaintiff fails to state a claim under the ADA and RA; (14) Plaintiff is not entitled to a preliminary injunction; and (15) Defendants are entitled to qualified immunity. Defendants attach approximately 657 pages of documents to their summary judgment motion, the vast majority of which are Plaintiff's TCCC disciplinary records from November 2022 through November 2025. They also attach an affidavit from Jessica Marsh, which they also included in their motion to dismiss; Management & Training Corporation's (MTC) SMU Policy; and Plaintiff's supervision progress report for August to October 2025. (ECF No. 103.)

In response, Plaintiff essentially restates his arguments from his Fourth Amended Complaint. Regarding his claim that Defendants have violated his First Amendment right to associate with his mother, he argues the proper standard for analyzing this claim is the "time place and manner" restriction found in schools. Plaintiff has also submitted approximately 585 pages of summary judgment evidence, including two versions of the SMU policy, TCCO Policy 4.1 on tiered programming and movement between tiers; the TDCJ handbook; a variety of reports and grievances from Plaintiff's time at TCCC; Plaintiff's mental health records; a property inventory sheet; Plaintiff's biennial reviews from 2017 to 2025; and several personal affidavits. (ECF Nos. 114-15, 120-121.)[2] Defendants have also replied to Plaintiff's response. (ECF No. 124.)

Plaintiff also has two pending motions. First, he moves for additional discovery, listing 33 different types of documents. (ECF No. 107.) Plaintiff also moves for the appointment of an expert to assist the Court. (ECF No. 122.)

---

[2] The Court disregards Plaintiff's summary judgment documents filed on March 2, 2026 (ECF No. 117) because he filed those same documents plus an additional 100 pages of documents on March 23, 2026 (ECF No. 120).

## II. LEGAL STANDARDS

<u>1. Failure to State a Claim</u>

Although Defendants move for summary judgment, "[a] district court may dismiss a complaint for failure to state a claim on its own motion 'as long as the procedure is fair.'" *Miller v. Sam Houston State Univ.*, 986 F.3d 880, 888 (5th Cir. 2021) (citation omitted). Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient facts to state a claim for relief that is plausible on its face. FED. R. CIV. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 566 U.S. at 678.

In deciding a motion to dismiss under Rule 12(b)(6), a court will accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *See Raj v. La. State Univ.*, 714 F.3d 322, 329-30 (5th Cir. 2013). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 679. Further, a plaintiff's factual allegations must establish more than just the "sheer possibility" a defendant has acted unlawfully. *Id.*; *Twombly*, 550 U.S. at 555 (factual allegations must be enough to raise a right to relief above the speculative level) (citation omitted). Determining a complaint's plausibility is a "context-specific task," but if the factual allegations "do not permit the court to infer more than the mere possibility of misconduct" the complaint has failed to meet the required pleading standard. *Iqbal*, 566 U.S. at 678.

The Court construes a pro se plaintiff's allegations liberally, holding the plaintiff to "less stringent pleading standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). However, a plaintiff's pro se status does not offer him an "impenetrable shield, for one acting *pro se* has no license to harass others, clog the judicial machinery with meritless litigation, and abuse already overloaded court dockets." *Farguson v. MBank Houston, N.A.*, 808 F.2d 358, 359 (5th Cir. 1986).

2. Summary Judgment

"Summary judgment must be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trammell v. Fruge*, 868 F.3d 332, 338 (5th Cir. 2017) (quoting FED. R. CIV. P. 56(a)). The court "'view[s] the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.'" *Hanks* v. *Rogers*, 853 F.3d 738, 743 (5th Cir. 2017) (quoting *Deville v. Marcantel*, 567 F.3d 156, 163-64 (5th Cir. 2009)).

Both movants and non-movants bear burdens of proof in the summary judgment process. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The movant with the burden of proof at trial must establish every essential element of its claim or affirmative defense. *Id.* at 322. The moving party without the burden of proof needs only point to the absence of evidence on an essential element of the non-movant's claims or affirmative defenses. *Id.* at 323-24. At that point, the burden shifts to the non-moving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. The non-moving party cannot rely on general allegations but must produce "specific facts" showing a genuine issue for trial. *Tubacex v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).

In deciding whether to grant summary judgment, "[t]he standard of review is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon the evidence before the court." *See id.*

## III. SUMMARY JUDGMENT EVIDENCE

The parties' summary judgment evidence shows the following.[3]

In December 2014, prior to Plaintiff's civil commitment, he was seen by a physician in Galveston, Texas, for his carpal tunnel symptoms and the doctor recommended he be evaluated by a surgeon for treatment. (ECF No. 120 at 385.)

On July 15, 2022, Plaintiff filed a grievance stating TCCC's property manager told him he could only have religious and legal books while housed in the SMU. A TCCC officer replied that plaintiff could have legal, religious, or treatment materials in SMU but he was not allowed to order books while he was on package restriction. (*Id.* at 69-70.) On October 2, 2022, Plaintiff requested to order three books and a staff member responded that books and movies were not currently being reviewed. (*Id.* at 75.)

On November 22, 2022, Plaintiff was in a SMU cell when he began cursing and threw a cup of coffee and juice at various TCCC security officers. (ECF No. 103-2 at 3, 7.) On December 12, 2022, he attended a Behavior Management Review (BMR), where he was punished with additional time in the SMU and 180 days of package restriction. (*Id.* at 15-17.) On December 24 and 25, 2022, Plaintiff had unapproved contact with the mother of another TCCC client. (*Id.* at 19-21.) The BMR report states he refused to attend the hearing. (*Id.* at 22.)

[3] The Court includes Plaintiff's fourth amended complaint in the summary judgment evidence because he verified it under "penalty of perjury that the foregoing is true and correct." As such, it constitutes competent summary judgment evidence. *See Hernandez v. Velasquez*, 522 F.3d 556, 561 (5th Cir. 2008) (verified pleadings are competent evidence at summary judgment); *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003) (complaint signed with declaration of penalty under perjury that "foregoing is true and correct" was verified).

On January 25, 2023, a TCCC officer found a pair of handcuffs in Plaintiff's room, inside a packet of legal paperwork. (*Id.* at 23.) That same day, after Plaintiff was ordered not to use the phone, he rushed toward the phone and started to dial. After an Incident Command System (ICS) was initiated, Plaintiff took a TCCC security officer's phone, threw it on the floor, threatened to hit a security officer, and threw a cup of juice at two officers. (*Id.* at 30.) On January 26, 2023, Plaintiff was reported for threatening to inflict harm, physical or otherwise, on any person who is not a TCCC client (hereinafter "threatening") when he told the TCCC property manager, "I don't have anything else to lose so you should be worried." (*Id*. at 26.) On January 30, 2023, Defendant Peralta requested a warrant be issued for Plaintiff after he refused to have his GPS ankle monitor changed. (*Id.* at 37.) On February 13, 2023, as a security officer opened the tray slot for Plaintiff's SMU room, Plaintiff warned him he was going to throw "shit" out of the slot. Plaintiff then threw feces out of the slot. (*Id.* at 38.) Plaintiff was not allowed to attend the BMR hearings on these violations due to his aggressive behavior and was punished with 180 additional days in the SMU and 180 days of package restriction. (*Id.* at 41-47.)

On March 14, 2023, Plaintiff visited the nurse with complaints about injuries from his hand restraints. The nurse noted two marks on the right wrist with no swelling or bruising. The nurse taught Plaintiff on how to increase circulation to lessen the pain, along with how to use warm compresses and massage. (*Id.* at 55-56.)

On March 29, 2023, Plaintiff received a violation for threatening when he said, "Fuck this place, I'm going back to jail"; "any blue shirt [TCCC staff member] it doesn't matter who is going to be taught a lesson"; and "I'll just post up with a weapon." (*Id*. at 60.) On April 7, 2023, Plaintiff received a violation for refusing a direct order, when Plaintiff did not end a phone call when ordered to, and also refused a pat down upon entering his room. (*Id.* at 63, 65.) Plaintiff attended

the BMR hearing for the two violations and received a verbal warning and seven days of package restriction. (*Id.* at 69-70.)

On April 18, 2023, Plaintiff sought medical treatment for his right ankle due to the GPS ankle monitor rubbing his skin. The nurse noted there was a closed abrasion on the right ankle and no treatment was required. (*Id.* at 72.)

On April 24, 2023, Plaintiff was in the SMU's law library when he refused to submit to hand restraints so he could be escorted back to his room. An ICS was initiated and after Plaintiff refused three orders to comply, a TCCC officer sprayed him for three seconds with chemical agents. Plaintiff still refused to comply with hand restraints. A five-man extraction team entered the law library, and Plaintiff began spitting on the TCCC officer. Plaintiff was again sprayed with chemical agents but it was ineffective. Plaintiff began kicking the extraction team and punched one of the officers; he then reached beneath the officer's face shield and attempted to gouge out the officer's eye. Finally, Plaintiff was retrained with a leg iron and hand restraints. Plaintiff was then taken to medical for injury assessment. Plaintiff was not cooperative during the medical examination and the nurse noted several abrasions and scratches on his body. Plaintiff then returned to his SMU cell where he managed to keep possession of his hand restraints when they were being removed. Plaintiff then positioned the hand restraint so that it could be used as a weapon and told the TCCC officers to come into his room. The officers sprayed chemical agents in his room through the food port and Plaintiff attempted to assault them by aggressively swinging a two-foot scrub brush out of the food port. With the five-man extraction team waiting outside, an officer opened Plaintiff's door and sprayed a three-second burst of chemical agent into Plaintiff's face. The extraction team entered and eventually removed the hand restraint from Plaintiff. The officer asked Plaintiff if he would like medical attention, and Plaintiff refused. The officer gave

Plaintiff verbal instructions on how to decontaminate himself and his room. Afterward, all five officers suffered injuries, including one officer who went to the emergency room for injuries to his eye. (*Id.* at 99-128.)

On April 26, 2023, Plaintiff was written up for violating the rules when he asked another TCCC client to call his mother for him and tell her he was okay. (*Id.* at 82.) Later that day, Plaintiff was written up for saying he was "ready to go at it again cause nothing's going to happen to him anyways" and that he was "trying to do anything he can to get sent back to county jail or prison." (*Id.* at 85.) On April 27, 2023, Plaintiff was written up for telling a security officer to "kiss his ass." (*Id.* at 87.) On April 28, 2023, Plaintiff received a violation for assaulting a person who is not a SVP client, resulting in no injury, when he threw a carton of spoiled milk at a TCCC officer. (*Id.* at 89.) On April 29, 2023, Plaintiff was written up for not complying with hand restraints. (*Id.* at 94.)

Plaintiff did not attend the BMR hearing for the violations and incidents from April 23-29 because of his aggressive behavior towards staff. In total, Plaintiff was punished with 120 days in the SMU, 180 days package restriction, and 30 days phone restriction upon approval of contacts. (*Id.* at 129-132.)

On May 2, 2023, Plaintiff filed a grievance that he was being treated differently than other clients in the SMU. Staff responded, "Every client is treated equally and based on their behavior." (ECF No. 120 at 80-81.) On May 15, 2023, Plaintiff was promoted to Tier 2 based on completing the Tier 1 curricula; however, due to his behavior and incident reports, he remained with Tier 1 housing and privileges. (*Id.* at 153.) On May 22, 2023, Plaintiff filed a grievance alleging that TCCC Officer Schmoker did not allow him out of his SMU cell for recreation or the law library. Staff responded, "Security precautions enacted based on your negative behavior are not forms of

punishment." The same day, Plaintiff filed a grievance alleging Schmoker had restricted his phone access from January 2023 to April 25, 2023. Staff responded, "The restrictions were a security precaution due to your violent and threatening behavior. Security precautions are not forms of punishment." (*Id.* at 76-79.)

On May 25, 2023, Plaintiff was arrested by the Lamb County Sheriff for "assault bodily injury employee/contractor/civil commitment and Harassment by persons in corrections/detention/civil commitment." (*Id.* at 176.)

On July 1, 2023, Plaintiff returned to the TCCC. A TCCC officer was going through his property and found 9 bags of coffee hidden in his legal paperwork. (ECF No. 103-2 at 133.) On July 3, 2023, Plaintiff received a violation for threatening for saying he would beat up every blue shirt he comes into contact with. (*Id.* at 139.) On July 6, 2023, Plaintiff received a violation for threatening when he said, "If you write something fucked up I'm going to get you personally.…You'll be smelling piss and shit all day." (*Id.* at 143.) He received 30 days wing restriction and 180 day package restriction for this violation. (*Id.* at 243.)

On July 19, 2023, Plaintiff was written up for refusing to take down papers that were covering the window in his SMU cell and for failing to take his arms out of the food port. (*Id.* at 154, 158.) On July 26, 2023, Plaintiff received a violation for assaulting any person who is not a SVP client, resulting in no injury, when he threw spoiled milk on a TCCC officer who was passing out food trays at breakfast time. (*Id*. at 170-76.)

On July 22, 2023, another TCCC client, Anthony Wiley, reported that a TCCC staff member went over to Plaintiff's cell, called him a "baby rapist," and said he would send Plaintiff back to prison whatever it takes. (ECF No. 120 at 115-16.)

On July 27, 2023, Peralta visited Plaintiff in the SMU regarding the approval of collateral contacts for mail supervision only. Plaintiff inquired why his mother, Patsy Lonnell Hanks, was not an approved contact, and Peralta stated Hanks had violated the rules of contact due to third party contact through the mother of another TCCC client. Plaintiff responded, "Maybe my behavior needs to get worse, you fucking bitch!" (ECF No. 103-2 at 219.) Later that afternoon, Plaintiff received several violations for assault for throwing red liquid on TCCC officers; he also threw feces out of his food slot using a shirt soaked with liquid. (*Id.* at 196-212.) On July 29, 2023, Plaintiff again threw an unknown liquid out of his food slot along with feces. Plaintiff responded to the charges by saying that things would get worse until they put his mother back on his collateral contacts list. (*Id.* at 216-17.)

On August 1, 2023, Plaintiff received another violation for assault when he threw an unknown substance on a TCCC officer. A few hours later, Plaintiff received a violation for creating a disturbance when he threw bags of feces out of the food port all over the walls and floor. (*Id.* at 244-247.) During these events Plaintiff's hand was injured. The nurse noted a gash on the back of his left hand approximately 2-3 cm area with no active bleeding. The nurse cleansed the wound and reported that Plaintiff refused any other treatment. (*Id.* at 256.) Plaintiff disputes this, stating he did not refuse treatment. (ECF No. 120 at 107.)

Plaintiff's July 2023 Progress Note states he is currently on "pending" status due to his pending criminal charges. It further states that "He is not attending groups for this reason. While remaining in SMU, he is provided additional assignments." The note further states Plaintiff "has not completed any of the assignments provided him by this CT" and that he "has progressively digressed over this reporting period. He has refused to participate in treatment activities and assessments. He refuses to sign documentation. He has showed aggressive behavior towards

others." At the end, the report states "work from any treatment books … cannot be counted toward Tier 1 or Tier 2 tracking sheets, as you are on pending status and not yet in a tier level. These assignments are meant to target specific behavioral issues and not specific tier-level work." (ECF No. 120 at 155.)

On August 2, 2023, Peralta requested a warrant for Plaintiff because he had failed to charge his GPS ankle monitor since returning to the TCCC on July 1, 2023. (ECF No. 103-2 at 262.) At a BMR held on August 11, 2023, Plaintiff was not present due to aggressive behavior. He received 60 days in the SMU and 180 days package/commissary restriction for the July 19 violations. (*Id.* at 263-64.) On August 8, 2023, Plaintiff filed a grievance that a TCCC officer would not permit him books that are in his property and approved by his therapist. Staff responded that Plaintiff had all the books he was approved to have. (ECF No. 120 at 73-74.)

Plaintiff submitted a series of emails from his mother to Defendants Gougler, Peralta, and Greenwalt, between July and August 2023, regarding why she and her family have not heard from Plaintiff. Peralta responded that Plaintiff does not have contacts and that her emails are being reviewed. (*Id.* at 142, 145-150, 151.) On August 31, 2023, Plaintiff's contact with his mother was reestablished and his other contacts were no longer on supervised mail. (*Id*. at 177.)

At a BMR hearing held on September 1, 2023, which Plaintiff was not allowed to attend due to dangerous behavior, he received a total of 90 days in the SMU along with 180 days of package/commissary restriction for the violations from July 26 through August 1. (ECF No. 103-2 at 290-300.) He later received 30 days in the SMU and 180 days package/commissary restriction for the August 25 violation. (*Id*. at 301.)

Plaintiff's August 2023 progress note states he was refusing to complete the additional assignments staff had provided for him. (ECF No. 120 at 160.) The September, October, and

November 2023 progress notes state he has been placed on "refuser" status because he was refusing to complete any assignments. (*Id.* at 162, 164, 165.) Plaintiff returned to group therapy in December 2023 and was placed in treatment Tier 2. (*Id*. at 166.)

In November 2023, Plaintiff filed a grievance stating he was being fed differently than other SMU residents. In response, TCCC staff stated he was being sent Styrofoam trays for all his meals; that condiments were being taped to the trays; that the food service manager took pictures of his food trays before delivery; and that Plaintiff was being fed the same items as the entire facility. (*Id*. at 192.)

On December 13, 2023, Plaintiff was seen by a doctor at TCCC for his urological problems. The doctor noted that Plaintiff stated he was not receiving any improvement with his medications and that he was waking up at least once an hour at night. The physician recommended referring Plaintiff to Lubbock Urology and also recommended a referral to psychiatry. (*Id.* at 390.)

On December 24, 2023, Plaintiff received a violation for unauthorized or unwanted physical contact with any person for pushing the arm of a TCCC officer during an argument over how the officer conducted room checks. (ECF No. 103-2 at 303.) On January 4, 2024, Plaintiff received a violation after he threatened a TCCC security officer that "we would fight" if the officer took away Plaintiff's television. Plaintiff agreed to turn over the television once the Lamb County Sheriff's department arrived to witness the transfer because he believed MTC was stealing his property. (*Id.* at 311, 313.) On January 8, 2024, Plaintiff received a violation for being out of place when he went to the TCCO office without being asked to go there. (*Id*. at 315.) On January 8, 2024, Peralta charged Plaintiff with violating the rules when he spoke to her loudly when she served him with an incident report, threw the report on the ground, and said "Do you want me to start acting like I did in the past?" (ECF No. 103-3 at 4.)

A BMR hearing on the unauthorized contact violation was conducted on January 10, 2024; the report states Plaintiff refused to attend the hearing. Plaintiff received 15 days dorm restriction, 15 days phone restriction, and 90 days package/commissary restriction. (*Id.* at 317.) At a January 31, 2024, BMR hearing, Plaintiff received 15 days dorm restriction for the January 4 incident regarding his television and 15 days phone restriction for the January 8 incident with Peralta. (ECF No. 103-3 at 8-9.) On January 31, 2024, Plaintiff received a 15-day visit restriction after he used vulgar language when a BMR hearing officer delivered his punishments. (*Id.* at 10, 18.)

Plaintiff's January 2024 progress note states he is in Tier 2 and "was kind and respectful to the group and the therapist." (ECF No. 120 at 169.)

On February 13, 2024, Plaintiff received a violation for unauthorized or unwanted physical contact when he pushed another TCCC client after the client ran into him with a cleaning machine. (ECF No. 103-3 at 22.) Plaintiff received a 15-day dorm restriction and 90 days package/commissary restriction for this violation. (*Id.* at 26.)

Plaintiff's February 2024 progress note states he "continues to engage fully in treatment, feedback, and discussion. … [Plaintiff] is respectful to his CT and the other group members." (ECF No. 120 at 170.)

On March 3, 2024, Plaintiff was charged with creating a disturbance when he urinated on a fence during a video visit and then refused to terminate the video visit and refused to submit to a pat search. He was also charged with using vulgar language. (ECF No. 103-3 at 27-28, 38.) On March 26, 2024, Plaintiff was charged with being out of place when he walked into the SMU when he was not assigned to it. (*Id.* at 45.) On March 29, 2024, Plaintiff received a violation for damaging or destroying property when he and another TCCC client fought in the law library and Plaintiff broke the client's flash drive while taking it out of a computer. (*Id.* at 49.)

In Plaintiff's March 2024 progress note, signed on April 3, 2024, Plaintiff's treatment provider Travis Pittock states Plaintiff is "progressing in his treatment. He is to be commended for improving the quality of his feedback." (ECF No. 120 at 172.)

At an April 3 and April 10 BMR hearing, which Plaintiff attended, he received a total of 30 days visitation restriction, 45 days dorm restriction, 15 days phone restriction, and 180 days package/commissary restriction for the March violations. (ECF No. 103-3 at 62-65.) After the April 10, 2024, BMR hearing, Plaintiff received a violation for vulgar language for pushing a chair over and saying to the BMR panel, "fuck you, to all of you" and flipping off the panel. (*Id.* at 67.) Plaintiff received a violation for threatening on April 11, 2024, when he refused to get off a phone call and said about the TCCC Chief of Security, "Next time I see him, I'll slap him. I'd probably kill him." (*Id.* at 70.)

On April 11, 2024, Plaintiff's treatment tier was reduced from Tier 2 to Tier 1. The "Review/Change in Tier" form states, "[t]he treatment team agrees Mr. Welsh is not meeting the goals of Tier [2]. The treatment team agrees he should be demoted to Tier 1." The form is signed by Travis Pittock and Defendant Peralta. (ECF No. 120 at 174.) In Plaintiff's April 2024 progress note, his new therapist, Ms. Sandoval, states that Plaintiff was demoted in tier because he "was not applying coping skills learned in treatment in his daily life due to a number of ongoing behavioral incidents." (*Id.* at 235.)

At a May 1, 2024, BMR hearing, which Plaintiff was not allowed to attend due to his aggressive behavior toward staff, Plaintiff received a total of 30 days wing restriction, 15 days phone restriction, 15 days of recreation restriction, and 180 days package/commissary restriction for the April 10 and 11 violations. (ECF No. 103-3 at 73-74.)

On April 30, 2024, Plaintiff received a violation for threatening when he told another client he would "kick his ass" if he woke him up again. (*Id.* at 75.) Later that day, Plaintiff received a violation for threatening when he told a TCCC officer he would make sure he never sees the "light of day again" if he took Plaintiff's mother away from him. (*Id.* at 79.) He received two more violations for assault and creating a disturbance when he pushed a TCCC officer and an ICS was initiated. (*Id.* at 83, 87.) Afterward, Plaintiff was taken to the SMU and placed on restraint restriction. (*Id.* at 86.) On May 1, 2024, Plaintiff received a violation for possession of contraband for having a Zedela USB 3.0 Card Reader Facility. (*Id.* at 104.) At a May 22, 2024, BMR hearing, Plaintiff received 120 days wing restriction for the April 30 and May 1 violations. (*Id.* at 107-111.)

On June 16, 2024, Plaintiff received a violation for refusing to accept a housing assignment when he refused to move from his room to a different room, after he complained that his assigned room did not have a desk. (*Id*. at 112.) Plaintiff refused to attend the July 17, 2024 BMR hearing where he was punished with 15 days wing restriction and 30 days package restriction. (*Id.* at 115.)

Plaintiff did not attend any group therapy sessions in May, June, or July 2024 because he was in the SMU. (ECF No. 120 at 237, 239, 241.)

On July 12, 2024, Plaintiff received a violation for not following TCCC rules during a visit with Defendant Heredia. During the visit, Plaintiff asked about his mother's collateral contact contract and told Heredia, "if I would have done what Bamsch did to CM Peralta, I would be in jail, able to talk to my mom and have commissary" and "this is not a threat, but if I wanted to I could get up and hurt you really bad and I would not stop like Bamsch did so I could go to jail." (ECF No. 103-3 at 116.) On July 17, 2024, Plaintiff was written up for violating TCCC rules when Heredia served him the incident report from July 12 and he became "very angry and disorderly" and cursed at Heredia multiple times, including saying "I'm going to kill you, you stupid bitch,

now that's a threat!" (*Id.* at 117.) Plaintiff attests that Heredia knew he was not threatening her at the July 12 meeting and told Plaintiff she had no choice but to write him up. (ECF No. 120 at 109.) On July 24, 2024, Plaintiff received a violation for refusing to obey orders when he did not allow a TCCC officer to pat search him upon re-entering his SMU room. (ECF No. 103-3 at 120.)

At the July 31, 2024, BMR hearing, which Plaintiff was not allowed to attend due to his threatening behavior, Plaintiff was punished with 60 days wing restriction, 30 days phone restriction, and 180 days package restriction for the July 12-24 violations. (*Id.* at 124-126.)

On August 5, 2024, Plaintiff received a violation for assault when he grabbed a TCCC officer's hand when they were conducting a pat search. (*Id.* at 176.) On August 7, 2024, Plaintiff received violations for removing his GPS ankle monitor (a criminal act), refusing to obey orders, possession of contraband, and threatening. (*Id.* at 127-148, 163.) At the August 28, 2024, BMR hearing, which Plaintiff was not allowed to attend due to his threatening behavior, he received 60 days wing restriction, 90 days phone restriction, and 360 days package restriction. (*Id.* at 167-71.)

On August 26, 2024, Plaintiff received a violation for tampering when he put his arm out of the food slot and tried to throw liquid soap at a TCCC officer. (*Id.* at 172.) At a September 25, 2024, BMR hearing, which Plaintiff did not attend because he was in police custody, he received 30 days wing restriction, 30 days phone restriction, and 180 days package restriction. (*Id.* at 183.)

Plaintiff returned from Lamb County Jail on December 10, 2024, and was housed in the SMU.[4] Although he completed his wing restriction on December 27, 2024, he remained in the SMU until his pending criminal charges—possession of a cell phone at Lamb County Jail, removal and destruction of a GPS ankle monitor, and assaulting security staff—were resolved. (*Id.* at 184.)

[4] There is nothing in the record stating when or why Plaintiff went to Lamb County Jail.

Plaintiff's August 2024 progress note states he is on "refuser" status, is not attending group therapy, and is not required to complete additional assignments. (ECF No. 120 at 243.) The note also states Plaintiff is on the mental health caseload but is not medication compliant. (*Id*. at 244.)

On January 2, 2025, an ICS was initiated when a TCCC officer believed Plaintiff had suicidal ideations. (ECF No. 103-3 at 187.) On March 7, 2025, Plaintiff received a violation for refusing to obey orders and threatening when he became upset with a TCCC officer's loud radio and attempted to throw liquid out of his food port. (*Id.* at 206, 212.) These violations were later dismissed because the video did not support them. (*Id*. at 218-19.)

On April 29, 2025, Dr. Sarah Iannucci wrote a letter stating she was Plaintiff's treating physician at the time of the alleged offense[5] and that she has "reason to believe he was legally insane at the time of the alleged offense due to the effects of unmedicated bipolar disorder, triggered complex trauma disorder, and prolonged indefinite isolation in solitary confinement." (ECF No. 120 at 397.)[6]

On May 15, 2025, Plaintiff received a violation for possession of contraband. (ECF No. 103-3 at 227.) On May 18, 2025, Plaintiff received a violation for creating a disturbance by throwing spoiled milk on the ground while another TCCC client was waxing the floor at 12:10 a.m. (*Id.* at 231.) On May 28, 2025, Plaintiff received a violation for assault when he threw applesauce on a TCCC officer. (*Id.* at 235.) On May 31, 2025, Plaintiff received another violation for assault when he threw liquid at a TCCC officer who refused to give Plaintiff an additional food

[5] Again, it is unclear to which offense Dr. Iannucci is referring.

[6] Plaintiff also submitted a letter from Dr. Iannucci, dated February 9, 2026, wherein she discusses his mental health history and treatment at TCCC. (ECF No. 120 at 393-96.) However, because the letter is neither sworn under penalty of perjury nor notarized, it is not competent summary judgment evidence. *See, e.g.*, *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1305-07 (5th Cir. 1988) (disregarding affidavit as summary judgment evidence where affidavit was not made "under penalty of perjury" and verified as "true and correct."); *Davis v. LeBlanc*, 539 F. App'x. 626, 628 (5th Cir. 2013) ("two unsworn [inmate] affidavits were not made under penalty of perjury and, thus, did not constitute competent summary judgment evidence").

tray. (*Id.* at 240.) Plaintiff received a violation for vulgar language on May 30, 2025, for calling a TCCC officer a "punk ass bitch" when the officer would not give him leftover food. (*Id.* at 244.)

On June 4, 2025, at a BMR which Plaintiff attended, he received 120 days wing restriction and 180 days package restriction for the May incidents. (*Id.* at 253-57.)

On June 5, 2025, Plaintiff received a violation for assault when he threw a white liquid substance at a TCCC officer. (*Id.* at 258.) On June 6, 2025, Plaintiff received a violation for threatening when he yelled "I'm gonna fuck you up you bitch" to a TCCC officer. (*Id.* at 270.) Plaintiff received a violation on June 7, 2025, for vulgar language when he banged on his door and called a TCCC officer a "faggot ass piece of shit." (*Id.* at 276.)

On a June 25, 2025, BMR hearing, which Plaintiff attended but made no statement, he received 30 days wing restriction and 180 days package restriction for the June 5-7 violations. (*Id.* at 284-86.)

On August 22, 2025, Plaintiff received a violation for refusing to obey an order when he refused to wait for an escort back to his SMU room. (*Id*. at 287.) At an August 22, 2025, BMR hearing, which Plaintiff attended, he received 10 days wing restriction and 30 days package restriction. (*Id.* at 291.)

On October 12, 2025, Plaintiff received a violation for using vulgar language when he called a TCCC officer "punk ass bitch, you pussy bitch." (*Id.* at 293.) On October 27, 2025, Plaintiff received a violation for gambling when a TCCC officer overhead him on the phone with someone making bets on multiple sporting events. (*Id.* at 309.) At a November 5, 2025, BMR hearing which Plaintiff attended, he received 40 days wing restriction, 10 days phone restriction, and 180 days package restriction for the violations. (*Id.* at 317-18.)

Plaintiff's August to October 2025 Supervision Progress Report states he is in Tier 2 and began attending treatment groups on October 22, 2025. It further states he is housed in the SMU, is on indefinite package restriction, has four approved collateral contacts with family members, and is no longer on restraint restriction. (ECF No. 103-5 at 3-4.)

Plaintiff submitted medical documents related to his mental health. In 2012, he was diagnosed with adjustment disorder with mixed depression and anxiety, along with features of borderline personality disorder. He was referred to inpatient psychiatric care for stabilization. (ECF No. 120 at 399.) On December 5, 2023, he received a mental health check in the SMU and requested Benadryl because he was not sleeping well. (*Id.* at 443.) On December 22, 2023, a mental health nurse evaluated Plaintiff after his release from the SMU when a TCCC staff member noted he was agitated. Plaintiff told the nurse he felt "overwhelmed" in the "big room" and she recommended he be considered for more appropriate housing. (*Id.* at 439.)

On December 29, 2023, Plaintiff had an initial evaluation with Dr. Iannucci. In her notes, Dr. Iannucci states Plaintiff had four prior suicide attempts, the last one being in August 2023 because he was not allowed to communicate with his mother. (*Id.* at 440-41.) On January 3, 2024, Plaintiff met with a counselor who reported he was interested in receiving counseling services. (*Id.* at 438.) Plaintiff had another counseling session on March 5, 2024, and at his April 23, 2024, counseling session, the counselor noted that Plaintiff's circumstances appeared to be worsening, with increased anxiety and hopelessness, especially with regard to the expectations of the sex offender therapy program. (*Id.* at 436-37.) Plaintiff was next seen on May 14 and 15, 2024, in the SMU and presented with very low mood, was frequently tearful and had a strong sense of hopelessness and helplessness. (*Id.* at 434.)

Plaintiff had an appointment with Dr. Iannucci on May 24, 2024, where he stated he was experiencing worsening depressed mood, hopelessness, anxiety, and insomnia. He stated he was in the SMU for another 5 months based on an altercation with another resident and an officer. Dr. Iannucci diagnosed Plaintiff with Post-Traumatic Stress Disorder (PTSD). (*Id.* at 432-33.) Plaintiff had a mental health check-in with a counselor on June 6, 2024, where he expressed some suicidal ideation and stated he was not sleeping more than two hours a night. (*Id.* at 431.) He had another appointment with Dr. Iannucci on June 14, 2024, where she stated he "remained on the fence" about taking medication. (*Id.* at 430.) He had a 60-minute counseling meeting on June 17, 2024, where he again reported low mood, hopelessness and helplessness. The counselor noted that the extension of Plaintiff's time in the SMU "appear to have exacerbated his emotional struggles." (*Id.* at 428.)

At a June 20, 2024, counseling check-in, Plaintiff appeared not to be sleeping, with deep circles under his eyes and unkept hair, and reported he felt like he was going crazy. (*Id.* at 427.) At a June 25 check-in, Plaintiff reported sleeping more and eating well, and appeared in positive spirits. (*Id.* at 426.) Plaintiff had a counseling session on June 27, 2024, where he continued to struggle with an unspecified mood disorder, which was manifested as unhappiness and hopelessness. (*Id.* at 424.)

Plaintiff met with Dr. Iannucci on July 5, 2024, where he appeared to have the same depression and low mood. (*Id.* at 423.) At Plaintiff's July 22, 2024, counseling session, he appeared visibly distressed and admitted to consistent suicidal ideations. The counselor believed this signified a "critical need for continued and possibly intensified therapeutic intervention." (*Id.* at 419.) Plaintiff met with Dr. Iannucci on July 23, August 2, and August 23, 2024. (*Id.* at 414-17.)

He saw Dr. Iannucci on September 17, 2024, where they discussed his medication regime. (*Id.* at 412.)

At a December 2024 mental health check-in, the counselor noted Plaintiff had returned from jail with increased anxiety and became teary-eyed when talking about not being able to speak with his mother. He requested to see Dr. Iannucci to restart anxiety medication. (*Id.* at 411.) Plaintiff met with Dr. Iannucci on December 20, 2024, where he reported increased anxiety and feeling like he was in a coffin in the SMU. (*Id.* at 407.) At Plaintiff's February 3, 2025, meeting with Dr. Iannucci, which is the last mental health note in the record, he expressed frustration about still being in the SMU and agreed to trial a low dose of a medication to control insomnia, anxiety, and mood swings. (*Id.* at 401.)

Plaintiff also submitted an affidavit in opposition to Defendants' summary judgment motion, attesting he has been mostly housed in the SMU since January 2020. He states that SMU staff keep him awake all night by slamming doors and playing their radios loudly. He attests he personally complained to Defendant McLane about this, but she has refused to do anything about it. Plaintiff attests that he lives in a stripped down cell with a solid metal door and only has bedding, hygiene, clothing, and legal work and that he is not allowed to read a book or talk to anyone. He attests there is a sign up stating that if other clients talk to Plaintiff, they will be written up. He states he is confined to his cell all day aside from one hour of recreation time and, Monday through Thursday, one hour in the law library. On the weekends, he is confined all day with no breaks. He attests he is denied all visits from his family, either in person or on Zoom. He attests the recreation cage has no equipment and little room to exercise and that the lights are on in the SMU all the time. Plaintiff states he has developed a mental condition whereby he hears things and thinks

people are touching him. He attests he has attempted suicide twice: once in May 2023, and again on August 4, 2023. (*Id.* at 90-95.)

Plaintiff attests he is not allowed individualized treatment for his psychological disorders, only medication. He attests his psychological appointments are either delayed or cancelled because he is in the SMU. Plaintiff attests a TCCC staff member told him he could not see a specialist for the neuropathy in his hands—which causes him severe pain and keeps him up at night—due to funding issues. (*Id.* at 95-96.)

Plaintiff attests that he has been put on restraint restriction with no due process and been denied his property, including 10 bags of coffee and 40 bags of tuna fish, with no due process. Plaintiff attests that Defendant Greenwalt has not allowed Plaintiff to attend Behavior Management Review (BMR) hearings and punished him with time in the SMU when other residents, who committed the same offense, were not punished as harshly. (*Id.* at 96-97.)

Plaintiff attests he was denied sex offender treatment while in the SMU. He attests he received cognitive treatment only from May 2022 until April 2023, when he was approved for sex offender treatment but not group treatment. (*Id.* at 98.)

Plaintiff attests that on June 28, 2023, he was in Lamb County Jail when Greenwalt and Peralta came to visit him. They told Plaintiff that if he bonded out of jail, he would regret it; he would be housed in the SMU with no privileges and with no sex offender treatment. When Plaintiff subsequently bonded out of Lamb County Jail, he was not allowed outside of his cell, was placed on restraint restriction, and given two cases for threatening in July 2023. Plaintiff attests that the TCCC officers who reported the violations told Plaintiff Defendants Greenwalt and Peralta requested that they write Plaintiff up. Plaintiff alleges that, during this time, his legal flash drive was destroyed, he was denied hygiene and fed less that other clients; he lost 25 pounds and was

not allowed to call or write to anyone. When he asked Peralta about his treatment, Plaintiff attests she said she had warned him about coming back to TCCC. Plaintiff was also reduced to Tier 1. (*Id.* at 99-101.)

Plaintiff attests that, when he regained his contacts, he nonetheless was not allowed to contact his mother due to her contact with another client's family member. He attests this lack of contact caused him to lose his mind where he cried all the time, had nightmares, and started to play in his own feces. He alleges there was feces all over his room but that TCCC staff refused to allow him to clean it up. (*Id.* at 101-02.)

Plaintiff attests that, twice, McLane required TCCC staff to write Plaintiff up after Plaintiff requested the Lamb County Sheriff's department come to the TCCC. Plaintiff attests he was written up for several cases, and punished without due process, and that these cases also resulted in his treatment tier being reduced from Tier 2 to Tier 1. Plaintiff attests that there are monthly meetings regarding his treatment tier, but he is not allowed to attend these meetings. (*Id.* at 103-06.)

Plaintiff attests that, during a power-of-attorney phone call with his mother in April 2024, Peralta heard Plaintiff's mother state that she asked another TCCC client's wife to check on Plaintiff. Plaintiff's mother was again removed from his contacts. (*Id.* at 107-08.)

## IV. DISCUSSION & ANALYSIS

### 1. Substantive Due Process

Plaintiff alleges Defendants have violated his rights to substantive due process. As a civil committee, Plaintiff is "'entitled to more considerate treatment and conditions of confinement than criminal whose conditions of confinement are designed to punish'"; however, "the Constitution nevertheless affords a state wide latitude in crafting a civil commitment scheme." *Brown v. Taylor*,

911 F.3d 235, 243 (5th Cir. 2018) (quoting *Youngberg*, 457 U.S. 307, 321-22 (1982)). In the context of civil commitment, substantive due process requires "only that 'the conditions and duration of confinement … bear some reasonable relation to the purpose for which persons are committed.'" *Brown*, 911 F.3d at 243 (quoting *Seling v. Young*, 531 U.S. 250, 265 (2001)). In Texas, the purposes of civil commitment are the "twin goals of 'long-term supervision and treatment of sexually violent predators.'" *Id*. (citation omitted). Accordingly, Defendants are liable for violating Plaintiff's substantive due process rights only if the actions about which he complains do not bear a reasonable relationship with his long-term supervision and treatment.

*Personal property*

Plaintiff alleges McLane promulgated a policy that violated his substantive due process rights by confiscating his personal property in 2022, 2023, and 2024. He alleges the items confiscated were a television, PlayStation3, video games, a hot pot, and food items.

This claim fails for several reasons. First, Plaintiff fails to identify which policy McLane promulgated that violated his substantive due process rights. Defendant Marsh attests that "[c]lient property allowances are set forth in MTC Policy 906TH regarding Tiered Housing. MTC staff have the discretion to confiscate client property that is not in compliance with the safety, management, or tier status and privileges of TCCO clients pursuant to MTC Policy 906Search." (ECF No. 103-1.) No party submitted this policy to the Court.

Second, the summary judgment record shows that Plaintiff's property was confiscated because it was either not allowed for his treatment tier or because it was considered contraband. Plaintiff has not shown that a policy of allowing clients in higher treatment tiers more property privileges is not reasonably related to his treatment and supervision. Finally, the lost property Plaintiff complains about are the type of "*de minimis* restrictions 'with which the Constitution is

not concerned.'" *Senty-Haugen v. Goodno*, 462 U.S. 876, 886 n.7 (8th Cir. 2006) (quoting *Bell v. Wolfish*, 441 U.S. 520, 539 n.20 (1979)).

*GPS ankle monitor*

Plaintiff next argues that wearing a GPS ankle monitor violates his substantive due process rights. Texas Health and Safety Code § 841.082(a)(4)(A)(ii) requires TCCC residents in Tier One or Tier Two of treatment to wear a GPS ankle monitor. This statute appears to support Texas's twin goals of treatment and supervision by providing TCCC clients with an incentive to progress in treatment. Plaintiff fails to show this statute violates his substantive due process rights.

*Restraints*

Plaintiff argues the use of mechanical restraints violates his right to substantive due process. McLane does not address this claim directly and neither party provides the Court with any MTC or TCCO policy on restraints.

Texas Health and Safety Code § 841.0838 governs the use of mechanical and chemical restraints for SVPs. It requires any employees using restraints to complete a training program. Further, mechanical restraints should only be used if "considered necessary to maintain the safety and security of the center or staff; considered necessary to maintain the safety of the public; and the least restrictive restraint necessary, used for the minimum duration necessary." TEX. HEALTH & SAFETY CODE ANN. § 841.0838(a)(2).

The summary judgment record shows that the times when TCCC employees used mechanical restraints on Plaintiff were when he was throwing items out of his SMU cell, such as spoiled milk and his own feces, or when he was physically assaulting TCCC staff. Based on these facts, the Court cannot say that there is a genuine issue of material fact whether McLane's policy

governing the use of mechanical restraints does not bear a reasonable relationship to Plaintiff's treatment and supervision.

*Pat searches*

Plaintiff next argues McLane and Marsh violated his Fourteenth Amendment right to be free from harassing pat searches. Plaintiff alleges he is subjected to too many pat searches while in the SMU. In the SMU policy, it states that "[a]n SVP Client on Wing Restriction, who is authorized to attend a Center activity or appointment, shall be pat searched prior to leaving the unit." (ECF No. 120 at 11.) The Court concludes these pat searches do not rise to the level of a constitutional violation.

*Mental health*

Plaintiff argues McLane's "policy and practices" resulted in the worsening of his mental health, causing him to have anxiety, depression, and suicidal thoughts. Plaintiff does not specify what practices and policies caused his mental health to decline. Further, it is apparent from Plaintiff's own summary judgment filings that his mental health issues predate his civil commitment, and that, starting in late 2023, he started to receive regular mental health care through in-person mental health check-ins, counseling services, and telehealth visits with Dr. Iannucci. Accordingly, standing alone, the Court concludes these allegations fail to state a claim for a violation of Plaintiff's substantive due process rights.

*Loss of treatment tier*

Plaintiff argues the loss of his treatment tier, from Tier 2 to Tier 1, violates his right to substantive due process. The summary judgment record shows that, on April 11, 2024, Plaintiff was in Tier 2 when his treatment team lowered him to Tier 1. The tier reduction form is signed by Plaintiff's treatment provider, Travis Pittock, and Defendant Peralta. Plaintiff's clinical therapist

noted that Plaintiff was demoted in tier because he "was not applying coping skills learned in treatment in his daily life due to a number of ongoing behavioral incidents." Plaintiff's loss of tier therefore appears to have a reasonable relationship to his supervision and treatment; as such, he has failed to show any Defendant violated his substantive due process rights.

*Greater punishment than other clients*

Plaintiff argues McLane ordered TCCC employees to punish him more than other TCCC clients, thereby violating his substantive due process rights. Beyond Plaintiff's own allegations, there are no facts in the record supporting Plaintiff's allegations. To survive summary judgment, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324. The non-moving party cannot rely on general allegations but must produce "specific facts" showing a genuine issue for trial. *Tubacex v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). Because Plaintiff fails to meet this burden, this claim is denied.

*Removing mother as contact*

Plaintiff argues the removal of his mother from his collateral contact list violates his right to substantive due process. He argues the removal was a punishment and the state's interests could have been achieved by less harsh methods, although he does not describe any alternative means.

The summary judgment record shows that Plaintiff's mother was removed because TCCC and TCCO staff concluded she was violating TCCC rules by having third-party contact with TCCC clients with whom she was not an approved contact. In *Dunsmore v. McLane*, No. 21-50541, 2022 WL 3210681 at *2 (5th Cir. 2022), the Fifth Circuit concluded that "[r]estricting contact according to treatment objectives is rationally related" to the goals of treatment and supervision. Here, the

summary judgment evidence shows that Plaintiff's mother was removed from his contact list because she was not adhering to the TCCC's rules for contacting clients. Plaintiff has failed to show this action is not reasonably related to the State's goals of treatment and supervision and this claim is denied.

*Restrictions and duration of time in SMU*

Finally, Plaintiff argues that the length of time he has spent in the SMU and the restrictive conditions of confinement he experiences there violate his right to substantive due process. Plaintiff alleges he has been in the SMU for several years; that his mental health has deteriorated while in the SMU; that he cannot progress in his sex offender treatment while housed in the SMU; that he is not allowed to read books outside of legal materials and sex offender therapy manuals; that he had two suicide attempts while in the SMU in 2023; and that, in general, his conditions of confinement in the SMU are worse than those experienced by a TDCJ prisoner in solitary confinement. He argues this is excessive and unconstitutional punishment.

As previously noted, Plaintiff is "'entitled to more considerate treatment and conditions of confinement than criminal whose conditions of confinement are designed to punish'"; however, "the Constitution nevertheless affords a state wide latitude in crafting a civil commitment scheme." *Brown*, 911 F.3d at 243. In his summary judgment filings, Plaintiff submitted an inmate bed history which tracked his housing assignments from August 6, 2019, through December 5, 2025. (ECF No. 120 at 522.) It shows he has been housed in the E wing, which is where the SMU is located, for 1,383 days. During this time period, Plaintiff was not housed at the TCCC for a period of 665 days. As a result, between August 6, 2019, and December 5, 2025, Plaintiff was housed in the SMU 84% of the time.

The summary judgment record also shows Plaintiff had dozens of disciplinary infractions during this time period. Defendants argue that Plaintiff's long-term housing in the SMU is solely the result of his own "violent behavior and policy violations." Plaintiff argues he is being unconstitutionally punished by his long-term SMU placement, with no possibility of advancing in his sex offender treatment and ultimate release from civil commitment.

The State's interest in the civil commitment are the "twin goals" of treatment and supervision. As such, to show a violation of his right to substantive due process, Plaintiff has to show that an action or policy bears no reasonable relationship to the state's goals of treatment and supervision. Defendants submitted MTC's SMU policy, but the policy states nothing about time limits for a client's placement in the SMU.

The Court concludes there is a genuine issue of material fact whether Plaintiff's time in the SMU violates his right to substantive due process. There is evidence in the record showing that, at certain times, Plaintiff was unable to participate in therapy that would lead to his eventual release. There is also evidence that Plaintiff refused to participate in assignments. There is also evidence that Plaintiff has limited access to recreation in the SMU and cannot have books that are not legal, religious, or therapy based.

The state has "wide latitude" in creating its civil commitment program. *Brown*, 911 F.3d at 243. In the prison setting, "prison officials should be accorded the widest possible deference in classifying prisoners' custodial status as necessary to maintain security and preserve internal order." *Wilkerson v. Goodwin*, 774 F.3d 845, 852 (5th Cir. 2014) (citations omitted). Nonetheless, the need for safety and order "must coexist with constitutional dictates." *Id.* None of the named Defendants submitted affidavits explaining why Plaintiff must be housed in what appears to be long-term solitary confinement. The Court therefore concludes there is a genuine issue of material

fact whether Defendants' policies of keeping Plaintiff in the SMU bear a reasonable relationship to the goals of supervision and treatment.

2. Procedural Due Process

Plaintiff next alleges Defendants violated his rights to procedural due process. "The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must first establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). The Fifth Circuit has not expressly considered the procedural due process standard applicable to SVPs claiming a deprivation of their liberty interests. *See Welsh v. Correct Care Recovery Sols.*, 845 F. App'x 311, 323-24 (2021).

A prisoner's liberty interests will generally be limited to "freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, … nonetheless impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995). Other federal courts have applied the Supreme Court's holding in *Sandin v. Conner*, 515 U.S. 472 (1995), to civil committees like Plaintiff, who have been civilly committed based on prior sex offenses. *See Thielman v. Leean*, 282 F.3d 478, 482-84 (7th Cir. 2002) (to state a procedural due process claim, civilly-committed SVP "must identify a right to be free from restraint that imposes atypical and significant hardship in relation to the ordinary incidents of his confinement"); *see also Deavers v. Santiago*, 243 F. App'x 719, 721 (3d Cir. 2007) (absent an extreme deprivation of liberty, "the Constitution does not require that a [civilly committed person] *be afforded any process at all* prior to deprivations beyond that incident to normal [commitment] life" (emphasis in original)); *Sorenson v. Minn. Dep't of Human Servs.*, No. 14-4193 (ADM/LIB),

2015 WL 251720 at *16 (D. Minn. 2015) (applying the *Sandin* standard to civil committee in Minnesota's sex offender program). The Court will also apply the *Sandin* standard to Plaintiff's procedural due process claims based on deprivation of liberty.

*Personal property*

Plaintiff alleges Defendants violated his right to procedural due process by confiscating his personal property in 2022, 2023, and 2024 without providing a hearing. He alleges the items confiscated were a television, PlayStation3, video games, a hotpot, and food items.

Plaintiff cannot state a claim for a violation of procedural due process for items that were confiscated due to being contraband. *See Sullivan v. DeRamcy*, 460 F. App'x 374, 375 (5th Cir. 2012). Further, the other property items were taken due to Plaintiff's loss of treatment tier and the resulting loss of tier privileges. The loss of items like a television, hotpot, and video games are the type of "*de minimis* restrictions 'with which the Constitution is not concerned.'" *Senty-Haugen* 462 U.S. at 886 n.7. This claim fails as a matter of law.

*Monthly tier evaluations*

Plaintiff alleges McLane, Greenwalt, and Peralta violated his procedural due process rights by failing to provide him notice and a hearing regarding the monthly evaluation of his tier. Plaintiff alleges this is based off of McLane's policy but fails to identify what policy he is challenging.

To be entitled to procedural due process, Plaintiff needs to establish that he has a liberty interest in his monthly tier evaluations. To do this, he must identify a right to be free from restraint that imposes atypical and significant hardship in relation to the ordinary incidents of his confinement. Plaintiff does not show he has liberty interest in attending all monthly tier meetings, because meetings where his treatment tier is unchanged would not impose an atypical or significant hardship on him. This claim is denied.

*Restrictions greater than those in prison*

Plaintiff argues McLane violated his right to procedural due process by imposing greater restrictions on him than those experienced by convicted prisoners in TDCJ. This claim fails as a matter of law. First, a facility being "too prison-like" does not violate a civil committee's right to substantive due process. *Brown*, 911 F.3d at 243. Second, Plaintiff's liberty interests exist in relationship to the ordinary incidents of his civil commitment, not in relation to the ordinary incidents of a prisoner's confinement. As such, he does not have a procedural due process right to particular living conditions.

*Mechanical restraints*

Plaintiff argues McLane violated his procedural due process rights by creating and implementing a policy that allows for the use of mechanical restraints without professional judgement.[7] First, the professional judgment standard from *Youngberg* applies to substantive due process claims, not procedural due process claims. Second, Plaintiff fails to provide the Court with the policy he is challenging and the Court already concluded Texas Health and Safety Code § 841.0838 does not violate Plaintiff's rights to substantive due process. The Court cannot determine if a policy violates Plaintiff's constitutional rights without having the policy. Plaintiff has failed to carry his burden to go beyond the pleadings and designate specific facts showing there is genuine issue of fact for trial. This claim is denied.

*Greenwalt: SMU and personal property*

Plaintiff alleges Defendant Greenwalt violated his procedural due process rights by not allowing him to offer evidence, question witnesses, or attend disciplinary hearings that led to his

[7] The Court notes Plaintiff is litigating an almost identical claim against different defendants in *Welsh v. Mgmt. & Training Corp.*, No. 5:24-cv-00069 (N.D. Tex.).

placement in the SMU from March 2022 to May 2023, July 1, 2023, to December 2023, and April 2024 to September 2024, along with a year of property restrictions.

"Personal involvement is an essential element of a civil rights cause of action." *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983). Personal involvement requires "an affirmative link between the incident and some act by the defendant." *Rizzo v. Goode*, 423 U.S. 362, 363 (1976); *see also Lozano v. Smith*, 718 F.2d 756, 768 (5th Cir. 1983) (stating a defendant "must be either personally involved in the acts causing the deprivation of a person's constitutional rights, or there must be a causal connection between an act of the [defendant] and the constitutional violation sought to be redressed.")

There is no evidence in the record regarding Plaintiff's placement in the SMU in March 2022, nor how Greenwalt was personally involved in the decision. On July 1, 2023, Plaintiff was placed back in the SMU after he had bonded out of Lamb County Jail and there is nothing in the record showing how Greenwalt was involved in this decision. Regarding the April 2024 placement, the BMR documents state that Plaintiff was not in attendance due to his aggressive behavior towards staff. To survive summary judgment, Plaintiff must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.* 477 U.S. at 324. Outside of Plaintiff's allegations, there is nothing in the record supporting his argument that Greenwalt did not allow him to attend the BMR hearing. This claim is denied.

*Change in treatment tier*

Plaintiff next argues Defendant Peralta violated his procedural due process rights by reducing his treatment tier from Tier 2 to Tier 1 on July 1, 2023, and then again on April 11, 2024, and that McLane ordered Peralta to do this.

The summary judgment evidence shows that, on July 1, 2023, Plaintiff was on "pending" status because he had pending criminal charges against him. Although Peralta alerted him about his treatment status, there is no evidence suggesting she decided to reduce his treatment tier, nor is there evidence supporting Plaintiff's allegation that McLane ordered her to do it.

On April 11, 2024, Plaintiff's treatment team, which included Peralta, reduced his treatment tier from Tier 2 to Tier 1. In the prison context, a prisoner does not have a liberty interest in his custodial classification. *Hernandez v. Velasquez*, 522 F.3d 556, 562 (5th Cir. 2008) (per curiam). However, unlike prisoners, SVPs do not have criminal sentences and set terms of incarceration. Rather, they work through a tier treatment system, with SVPs in Tiers 1 through 4 residing at the TCCC, while Tier 5 clients reside in the community. To be released from civil commitment, the SVP must file a petition—either authorized by TCCO or not—for release, upon which a court conducts a hearing. *Id*. §§ 841.121-841.124. Texas law states "[t]he tiered program must provide for the seamless transition of a committed person from a total confinement facility to less restrictive housing and supervision and eventually to release from civil commitment, based on the person's behavior and progress in treatment." TEX. HEALTH & SAFETY CODE ANN. § 841.0831(b).

*Sandin* states that a prisoner's liberty interests will generally be limited to freedom from restraint that imposes an atypical and significant hardship in relation to the ordinary incidents of his confinement. Again, Plaintiff is not a prisoner, and his civil commitment must serve the goals of treatment and supervision rather than punishment. A reduction from a higher treatment tier to a lower one means a TCCC client loses a variety of privileges; although Plaintiff did not lose privileges (he was in Tier 2 treatment with Tier 1 privileges), his reduction in tier adds an additional, indeterminate amount of time to his civil commitment. Further, unlike prisoners, SVPs

do not have a set term of incarceration. They are only permitted to leave their civil commitment when TCCO and the committing court agree they no longer have a behavioral abnormality that poses a threat to the community. Based on these considerations, the Court concludes Plaintiff has a liberty interest in his treatment tier.

There is no evidence in the record on whether Plaintiff received notice and hearing prior to his treatment tier reduction. Accordingly, the Court concludes there is a genuine issue of material fact whether Peralta provided Plaintiff with any procedure prior to reducing his tier level.

Regarding McLane, there is no evidence in the record showing she personally ordered Plaintiff's treatment tier reduced from Tier 2 to Tier 1. However, TCCO's "Tiered Programming" policy states that "[a] client who demonstrates a regression in treatment or behavior may be reduced in tier as determined by the Treatment Team." (ECF No. 120 at 214.) There is nothing in this policy stating that TCCC client should be offered any due process prior to having his treatment tier reduced. A supervisor may be held liable if the supervisor implements a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind a constitutional deprivation. *Thompkins v. Belt*, 828 F.2d 298 (5th Cir. 1987). As the Executive Director of TCCO, McLane has "the authority to 'compel or constrain' the conditions" of confinement at TCCC. *Washington v. McLane*, No. 23-50235, 2025 WL 400030, at *3 (5th Cir. Feb. 5, 2025) (unpublished per curiam). Accordingly, the Court concludes there is also a genuine issue of material fact whether McLane created or endorsed a policy that violates Plaintiff's Fourteenth Amendment right to procedural due process.

*Removing collateral contacts*

Plaintiff next argues McLane, Peralta, and Marsh violated his constitutional rights when they removed his contact with his mother, Patsy Lonnell Hanks, without any procedural

protections. In *Hanks v. McLane*, No. 1:24-cv-00299-RP (W.D. Tex.), this Court analyzed whether TCCO's Policy 3.4, Approval of Contacts and Chaperones (hereinafter "the Contacts Policy"), violated Plaintiff's mother's right to procedural due process by not requiring any procedural protections prior to her removal as Plaintiff's contact. The Contacts Policy is not in the parties' summary judgment pleadings, but the Court takes judicial notice of it because it is available on the state's website.[8] *See Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005).

As relevant to the facts in this case, the Contacts Policy states that a person may be removed from a TCCC client's contact list if that person has knowledge of, encourages, or participates in a TCCC client's law or rule-breaking behaviors. If a contact is removed for that reason, the contact may only be reinstated if they have a specific family relationship with the client and, in some instances, after they pay for several different types of therapeutic interventions, including attending individual sessions with a Licensed Sex Offender Treatment Provider (LSOTP), attending educational sessions, and obtaining a criminal background check. If these interventions are successful, the contact must still gain approval from the client's treatment team. And, if the contact receives approval, they might still be required to finance further therapies as directed by TCCO. A contact removed for any other reason is not required to undergo therapy and only requires the consent of the client's treatment team and the Executive Director to be reinstated.

As a civil committee, Plaintiff has the right to correspond with others but restrictions on this right "are permissible so long as they advance the state's interest in security, order, and rehabilitation." *Bohannon v. Doe*, 527 F. App'x 283, 294-95 (5th Cir. 2013). Further, the Supreme Court has stated that "freedom of association is among the rights least compatible with incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). Plaintiff is not incarcerated,

---

[8] TCCO Policy 3.4, Approval of Contacts and Chaperones, https://tcco.texas.gov/sites/default/files/documents/policies/policy-3-4-approval-contacts-chaperones.pdf (last visited August 18, 2026).

however, and as a civil-committee, he is "'entitled to more considerate treatment and conditions of confinement'" than prisoners. *Brown*, 911 F.3d at 243.

In *Hanks*, this Court observed that the Contacts Policy does not require any procedural protections before an approved contact is removed. Once this happens, the person can either complete a series of therapeutic interventions and other tasks determined by TCCO officers and the client's treatment team, or the person may be reapproved as a contact if the TCCO Executive Director and the treatment team "anticipates the contact would be beneficial to the client." As such, once a person is removed as a contact, their ability to communicate with a TCCC client is at the complete discretion of TCCO.

The Court concludes this does not provide enough protection for either TCCC clients' or their contacts' constitutional rights. Before having their approved contact removed, a TCCC client should receive some process to challenge the removal, especially considering that the reinstatement of the contact can be financially burdensome and left to the complete discretion of TCCO. Accordingly, the Court concludes McLane, Peralta, and Marsh violated Plaintiff's procedural due process rights by removing his mother as a collateral contact without any procedural due process.

*SMU placement*

Finally, Plaintiff argues McLane, Greenwalt, and Marsh violated his procedural due process rights by placing him in the SMU for years without any procedural protections. As previously noted, Plaintiff received hearings for all of his behavioral infractions, although he was not present at many of these hearings because he was considered a safety threat. The issue, then, is whether Plaintiff has a right to be present at a hearing even if staff are concerned about his aggressive behavior.

Defendants argue Plaintiff does not have a right to be present at his BMR hearings because the MTC policy states: "SVP Clients …that may pose a threat to themselves or others due to their violent behavior, will not be permitted to attend the BMR." (ECF No. 103 at 22.) Defendants, however, fail to attach this policy to their summary judgment pleadings, despite stating they did so. They also rely on a Texas appellate court opinion to support their argument that Plaintiff does not have a right to attend his BMR hearings.

Prisoners do not have an absolute right to attend their disciplinary hearings. *See Moody v. Miller*, 864 F.2d 1178, 1180 (5th Cir. 1989). Rather, if a prisoner is unable or refuses to attend a disciplinary hearing, "due process requires no more than that the hearing be held in accordance with all of the other requirements of due process that are called for under the circumstances. Due process requires only that the government operate under procedures that give a person a fair *opportunity* to ensure that the governmental decision affecting that person's life, liberty, or property is just." *Id.* at 1181 (emphasis in original). There is no evidence suggesting Defendants did not give Plaintiff a fair opportunity to attend his BMR hearings. This claim is denied.

<u>3. First Amendment</u>

Plaintiff raises several claims arguing Defendants violated his right to freedom of association, freedom of speech, and retaliated against him based on his protected speech and conduct.

*Freedom of association*

Plaintiff argues Defendants McLane and Peralta violated his right to associate with his mother when they removed her from his approved contact list. Plaintiff further argues McLane, Peralta, and Marsh violated his freedom of association when they removed three family members from his contact list, i.e., Connie Echols, John Welsh, and Connor Hanks.

Generally speaking, "freedom of association is among the rights least compatible with incarceration," *Overton*, 539 U.S. at 131, and restrictions on a civil committee's First Amendment rights "are permissible so long as they advance the state's interest in security, order, and rehabilitation," *Bohannon*, 527 F. App'x at 294-95. In *Overton*, the Supreme Court upheld a prison regulation that imposed a two-year visitation restriction on inmates who had two substance-abuse violations, but in doing so, stated "[i]f the withdrawal of all visitation privileges were permanent or for a much longer period, or it were applied in an arbitrary manner to a particular inmate, the case would present different considerations."

Plaintiff's claim regarding his family members fails as a matter of law. They were removed from his contact list after he returned from Lamb County Jail in July 2023 but then were reinstated several weeks later. This short duration of restricting contact does not amount to a violation of Plaintiff's First Amendment rights.

Plaintiff's claim regarding his mother, however, yields a different result. Plaintiff alleges Defendants McLane and Peralta removed Plaintiff's mother from his contact list first in July 2023, and then again in April 2024, and that he has not communicated with his mother since then. Defendants fail to offer any evidence as to why Plaintiff's contact with his mother was terminated and has not been reinstated for over two years. They do not explain how this ban is reasonably related to the State's interest in security, order and rehabilitation.

"[P]rison walls do not form a barrier separating prison inmates from the protections of the Constitution, nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside.'" *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989) (quoting *Turner*, 482 U.S. at 84.) Plaintiff and his mother have a First Amendment right to associate and communicate; Defendants may enforce policies that limit that right only to the extent those

limitations are reasonably related to the State's interest in treatment and supervision. Defendants fail to offer any evidence showing that terminating Plaintiff's contact with his mother is reasonably related to Plaintiff's treatment and supervision. Accordingly, the Court concludes there is a genuine issue of material fact whether the ban on Plaintiff's contact with his mother violates his First Amendment right of association.

*Freedom of expression*

Plaintiff next argues McLane violated his First Amendment rights by restricting the type of clothing Plaintiff wears in the SMU, not allowing him to access the internet for ChatGPT or other entertainment, and not allowing him to have a cell phone. These claims all fail as a matter of law. Plaintiff's claim regarding his clothing in the SMU has no support in the record outside his own allegations and, regardless, does not rise to the level of a constitutional violation. Plaintiff's claims regarding his inability to access the internet or have a cell phoneare likewise conclusory and not developed in the summary judgment record. Further, in other litigation regarding TCCO policies at TCCC, Plaintiffs have alleged that clients in higher treatment tiers are able to use cell phones with internet access. *See, e.g.,* Complaint at 5, *Cardenas v. Gougler*, No. 1:25-cv-01027-ADA (W.D. Tex.). This claim is denied.

*Retaliation*

Plaintiff raises several retaliation claims: (1) McLane and Peralta retaliated against Plaintiff for his political advocacy by taking his mother off his contact list; (2) McLane, Peralta, Greenwalt, and Marsh retaliated against him for making bail by removing all his contacts; (3) McLane retaliated against him on December 18, 2023, when he asked for the Lamb County Sheriff to witness the removal of his television by filing a disciplinary case against him; and (4) McLane and Greenwalt retaliated against Plaintiff for his vulgar language.

"To state a valid claim for retaliation under [S]ection 1983, a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." *Brown*, 911 F.3d at 245 (quoting *Bibbs v. Early*, 541 F.3d 267, 270 (5th Cir. 2008)). The plaintiff must establish that "but for the retaliatory motive the complained of incident . . . would not have occurred." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995). Mere conclusory statements that retaliation occurred are not sufficient; rather, "the inmate must produce direct evidence of motivation or, … 'allege a chronology of events from which retaliation may plausibly be inferred.'" *Id.* (citation omitted).

Plaintiff's claim that McLane and Greenwalt retaliated against him for vulgarity fails as a matter of law because his allegations are conclusory. Further, Plaintiff's claim that McLane and Peralta retaliated against him by removing his mother from his contact list due to his political advocacy is also meritless. Plaintiff does not allege a chronology of events or even provide the Court with evidence, outside his own allegations, that he was engaging in political advocacy at that time and that McLane and Peralta knew of his political advocacy.

Plaintiff next argues McLane retaliated against him for the filing of this lawsuit and for requesting the Lamb County Sheriff's Department on December 18, 2023, when she had TCCC staff write a false disciplinary case against him, which resulted in restricting his ability to contact his family, purchase property, and exercise. The summary judgment evidence shows that, on January 4, 2024, a TCCC security officer went to retrieve Plaintiff's television because he only had Tier 1 privileges. When the officer arrived, Plaintiff told him they would fight if he came to get the television. Plaintiff eventually allowed the television to be taken away, but only after the Lamb County Sheriff's department was there to witness it. The next day Peralta referred Plaintiff to a BMR based on violating three civil commitment rules. The first BMR panel could not agree

on a punishment; the second BMR panel assessed 15 days of dorm restriction. (ECF No. 103-3 at 5, 8.)

The evidence before the Court does not support Plaintiff's claim of retaliation. There is no evidence that McLane was aware of the January 4 incident or directed either of the BMR panels on how to punish Plaintiff. Further, there is no chronology of events suggesting this action was based on Plaintiff's filing of this lawsuit.

Finally, Plaintiff alleges McLane, Peralta, Greenwalt, and Marsh retaliated against him for bonding out of Lamb County Jail by removing all of his contacts. In support of this, Plaintiff attests that Greenwalt and Peralta visited him at Lamb County Jail on June 28, 2023, and told Plaintiff that if he bailed out of jail, he would regret it: he would be housed in the SMU with no privileges and with no sex offender treatment. When Plaintiff subsequently bonded out of Lamb County Jail, he was not allowed outside of his cell, was placed on restraint restriction, and given two cases for threatening. Plaintiff attests that the TCCC officers who reported the violations told him Greenwalt and Peralta requested they write Plaintiff up. Plaintiff alleges that, during this time, his legal flash drive was destroyed, he was denied hygiene and fed less than other clients; he lost 25 pounds and was not allowed to call or write to anyone. When he asked Peralta about his treatment, Plaintiff attests she said she had warned him about coming back to TCCC. Plaintiff states he was also reduced to treatment Tier 1.

Plaintiff fails to state a claim against Marsh and McLane: there is no evidence they were personally involved in these actions or directed Greenwalt and Peralta in them. There is, however, a genuine issue of material fact whether Greenwalt and Peralta retaliated against Plaintiff for bonding out of Lamb County Jail. Plaintiff attests that Greenwalt and Peralta visited him and told

him he would regret bonding out. Three days later, when Plaintiff returned to TCCC, his collateral contacts were removed and, according to him, he experienced a myriad of other negative events.

Neither Greenwalt nor Peralta submitted affidavits challenging Plaintiff's version of events. They argue, instead, that Plaintiff's contact was restricted based on treatment objectives. However, there is nothing in the record suggesting what treatment objectives Greenwalt and Peralta were pursuing by restricting Plaintiff's contact with his family members. Accordingly, viewing the evidence in the light most favorable to Plaintiff, *see Luna v. Davis*, 59 F.4th 713, 715 (5th Cir. 2023), the Court concludes Plaintiff has created a genuine issue of material fact over whether Greenwalt and Peralta retaliated against him.

4. Equal Protection

Plaintiff next argues his right to equal protection has been violated by having to wear a GPS ankle monitor; receiving no sex offender treatment in the SMU; being treated worse than prisoners; McLane allowing him to be a Tier 2 in treatment but a Tier 1 in privileges; and McLane not treating him the same as the "violently criminally insane."

The Equal Protection Clause provides that "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. AMEND XIV § 1. The Equal Protection clause "does not forbid classifications" because "most laws differentiate in some fashion between classes of persons." *Harris v. Hahn*, 827 F.3d 359, 365 (5th Cir. 2016) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). Rather, it "keeps governmental decision makers from treating differently persons who are in all relevant respects alike." *Id.* If the allegations do not implicate suspect classes or fundamental rights, then "[t]he appropriate standard of review is whether the difference in treatment between [classes] rationally furthers a legitimate state interest." *Id.*

Plaintiff's claims regarding the treatment of TCCC clients versus prisoners or the "violently criminally insane" fail because these classes of individuals are not alike in all relevant aspects. The same is true for having to wear a GPS ankle monitor: Plaintiff argues it violates his right to equal protection because it discriminates against him based on his past crimes. But this is incorrect. The statute requires GPS ankle monitors only for clients in Tier 1 and Tier 2 of treatment, clients who reside in the community in treatment Tier 5, and clients who are either leaving the TCCC or on disciplinary status. *See* TEX. HEALTH & SAFETY CODE ANN. § 841.082(4)(A). The statute, therefore, only requires some SVPs to wear GPS ankle monitors, and thus does not discriminate based on past crimes.

Plaintiff argues McLane violated his right to equal protection by allowing him to be in treatment Tier 2 with Tier 1 privileges because he is not treated equally to other Tier 2 clients. This might be true, but it does not rise to the level of violation of Plaintiff's constitutional rights.

Finally, Plaintiff argues his right to equal protection is violated when he is not permitted to have sex offender treatment while in the SMU. The summary judgment evidence shows that Plaintiff was offered sex offender assignments while housed in the SMU, but that completion of these assignments "cannot be counted toward Tier 1 or Tier 2 tracking sheets, as you are on pending status and not yet in a tier level. These assignments are meant to target specific behavioral issues and not specific tier-level work." (ECF No. 120 at 156.) The summary judgment record also shows that when Plaintiff was in the SMU due to his behavior, he was not permitted to attend group therapy sessions, and that he was offered some treatment assignments but refused to complete them.

Again, these allegations fail to state an equal protection claim. TCCC clients in the SMU and TCCC clients not in the SMU are not alike in all relevant respects: some SMU residents, like

Plaintiff, are there based on their behavior and therefore are not the same as other TCCC clients. Further, it is rational for the TCCO not to allow some clients to attend group therapy if staff think there is a risk the client might harm others.

5. Failure to Train

Plaintiff next argues McLane failed to train security officers at the TCCC in the use of mechanical and chemical restraints, on the need to keep water in the cell after the use of chemical restraints, and in the need to move Plaintiff into a non-contaminated cell. He further argues McLane failed to train Peralta in the need to use procedural due process prior to removing Plaintiff's family members as his contacts.

"A supervisor may ... be liable for failure to supervise or train if: '(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.'" *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (quoting *Gates v. Tex. Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)). Merely negligent or incompetent supervision cannot form a basis for liability under § 1983; rather, the supervisor's actions or inactions must rise to the level of "deliberate indifference." *Id.*

A state actor acts with deliberate indifference only where he (1) "knows [the] [plaintiff] face[s] a substantial risk of serious harm" and (2) "disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). The "'failure to alleviate a significant risk that [the official] should have perceived, but did not' is insufficient to show deliberate indifference." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Farmer*, 511 U.S. at 838). "[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v.*

*Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001). Instead, the state actor "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (quoting *Farmer*, 511 U.S. at 837).

The only evidence in the summary judgment record regarding the use of mechanical and chemical restraints are incident reports when TCCC security used them against Plaintiff. In April 2023, a TCCC officer sprayed Plaintiff with a chemical restraint twice when he refused to submit to mechanical restraints and leave the law library. They later sprayed Plaintiff again in his SMU cell when he used his hand restraints as a weapon. The use of mechanical restraints appears to have occurred at various intervals during Plaintiff's confinement in the SMU. Neither party submitted the MTC or TCCO policies regarding the use of restraints in their summary judgment documents.

Plaintiff apparently does not enjoy having chemical restraints used against him or having to submit to mechanical restraints. However, this alone does not show that McLane failed to train subordinates on the proper use of chemical and mechanical restraints. Even construing the pleadings in his favor, this claim fails as a matter of law.

Plaintiff next argues McLane failed to train Peralta to provide Plaintiff with due process prior to removing his contacts. As discussed above, this Court only just decided that Plaintiff, and other TCCC clients, are entitled to procedural protections prior to their approved contacts being removed. Accordingly, because McLane was not aware, prior to this order, that Plaintiff was entitled to procedural protections, she cannot be liable for failing to train her staff regarding these protections. This claim is denied.

6. Deliberate Indifference

Plaintiff next raises a variety of claims based on deliberate indifference to his medical needs: (1) Greenwalt and Peralta were deliberately indifferent to his GPS ankle monitor wounding him; (2) McLane was deliberately indifferent to his need for sleep when she ordered the SMU staff to talk loudly and bang the doors at night; (3) McLane used the denial of medical care as punishment when Plaintiff was denied stitches for his hand and not allowed to see a urologist or specialist for his bilateral neuropathy; and (4) McLane is deliberately indifferent to Plaintiff's medical care because she fails to provide proper funding for care.

As a civil committee, Plaintiff's right to reasonably adequate medical care derives from the Eighth Amendment. *See Rogers v. Caswell*, 823 F. App'x 263, 264-65 (5th Cir. 2020) (per curiam) (analyzing whether civilly committed plaintiff pleaded facts supporting claim for deliberate indifference to serious medical needs); *Bohannan*, 527 F. App'x at 292 (applying Eighth Amendment standard to SVP's claim for deliberate indifference to serious medical needs). To state a claim for deliberate indifference regarding his medical care, Plaintiff must show "that a prison official 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (quoting *Domino*, 239 F.3d at 756). Claims of inadvertent failure to provide medical care or negligent diagnosis are insufficient to state a claim of inadequate medical care. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). Similarly, unsuccessful medical treatment or disagreement between an inmate and his doctor concerning the manner of treatment does not give rise to a constitutional cause of action. *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991). "[A] serious medical need is one for which treatment has been recommended or for which the need is

so apparent that even laymen would recognize that care is required." *Sims v. Griffin*, 35 F.4th 945, 949 (5th Cir. 2022) (quoting *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006)).

Regarding the GPS ankle monitor, Plaintiff alleges Greenwalt and Peralta were deliberately indifferent to his serious medical needs when they refused to change his ankle monitor, even though it was causing his ankle to bleed and causing him pain. The summary judgment evidence shows that, on April 19, 2023, Plaintiff sought treatment for his ankle due to the GPS monitor rubbing his skin. The nurse noted there was a closed abrasion on Plaintiff's right ankle and that no treatment was required. This is the only mention of a GPS-related ankle injury in the record. Not only is this injury not serious but there is no evidence suggesting Greenwalt and Peralta refused to offer Plaintiff medical care.

Plaintiff next claims McLane was deliberately indifferent to his medical needs by ordering SMU staff to talk loudly and bang doors throughout the night, causing Plaintiff to get little sleep, and by not sufficiently funding medical care for TCCC clients so that he can see a urologist and a specialist for his bilateral neuropathy. First, the record shows that Plaintiff was referred to a urologist in December 2023. Second, there is no evidence in the record, outside of Plaintiff's self-serving allegations, showing that McLane ordered SMU staff to disturb the sleep of SMU residents, nor that she has underfunded medical care for TCCC clients.

Finally, Plaintiff argues he was denied stitches when he injured his hand on August 1, 2023. Medical records show that Plaintiff had a 2-3 cm gash on his left hand, with no active bleeding. The nurse cleaned the wound and Plaintiff refused to have steri-strips applied to the wound and refused all other treatment. In his response, Plaintiff says it is not true that he refused all treatment. Again, however, even if this wound did rise to the level of a serious medical need, there is no

evidence in the record, apart from Plaintiff's allegations, that McLane had any knowledge of or involvement in the treatment of Plaintiff's wound.

7. RLUIPA

Plaintiff argues that his placement in the SMU violates RLUIPA because he is unable to attend religious services while there. However, Plaintiff does not seek any equitable or injunctive relief related to this alleged RLUIPA violation, and plaintiffs "cannot recover monetary damages against [] defendant-officials in their individual capacities under RLUIPA." *Landor v. La. Dep't of Corrs. and Pub. Servs.*, 82 F.4th 337, 344 (5th Cir. 2023), *aff'd* 146 S. Ct. 1931 (2026). As such, Plaintiff's claim under RLUIPA fails as a matter of law.

8. ADA & RA

Plaintiff next argues that McLane and Marsh violated his rights under the ADA and the RA because he has a qualifying mental illness and they failed to provide him reasonable accommodations and withheld services and benefits because of his mental illness.

The ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, under the RA, "[n]o qualified individual with a disability ... shall, solely by reason of her or his such disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Because the ADA and the RA contain similar language, the statutes are interpreted interchangeably. *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574 (5th Cir. 2002); *see also Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) ("The RA and the ADA are judged under the same legal standards, and the same remedies are available under both Acts.").

To state a claim under the ADA, Plaintiff must show: (1) "he is a qualified individual"; (2) "he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity"; and (3) this "exclusion, denial of benefits, or discrimination is by reason of his disability." *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004) (citing *Lightbourn v. Cnty. of El Paso*, 118 F.3d 421, 428 (5th Cir. 1997)). To state a claim under the RA, a plaintiff must show that: (1) he is a qualified individual with a disability; (2) the facility receives federal funding; and (3) he was adversely treated solely by reason of his disability. *See Chandler v. City of Dallas*, 2 F.3d 1385, 1390 (5th Cir. 1993).

The Court finds this claim unavailing. Plaintiff restates all his allegations regarding his conditions of confinement in arguing that they also support a claim under the ADA and RA. But Plaintiff never states what accommodation he requested that McLane and Marsh denied *because of* his mental illness. To establish a claim for failure to provide a reasonable accommodation, "a plaintiff must show that the entity knew of the disability and its consequential limitations, either because the plaintiff requested an accommodation or because the nature of the limitation was open and obvious." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 724 (5th Cir. 2020).

It is plausible that Plaintiff's long-term residency in the SMU is due, in large part, to his psychiatric issues. But Plaintiff must show that McLane and Marsh were aware of his mental illnesses and how it affected his behavior. Plaintiff points to his biennial reviews as proof of their knowledge. In Plaintiff's biennial report for 2017, the examiner noted that Plaintiff's "presentation was strongly suggestive of a bipolar mixed episode" and gave a diagnostic impression of "Bipolar Disorder, Mixed, Severe" as well as "Personality Disorder NOS (antisocial, borderline, narcissistic, paranoid, and obsessive-compulsive features." (ECF No. 120 at 449, 456.) The 2023

biennial report, with which Plaintiff refused to participate and was therefore based solely on the review of the records provided, gave a diagnostic impression of "Other Specific Personality Disorder (Mixed Personality Features)." (*Id.* at 465.) Finally, in the 2025 biennial report, the examiner offered diagnostic impressions of "Other Specified Bipolar and Related Disorder, With anxious distress, Moderate-sever, Most Recent Episode Depressed" as well as "Other Specified Personality Disorder, mixed personality features, by history." (*Id.* at 474.) The summary judgment record also shows that Plaintiff was reluctant to try medication to treat his mental illness and was, at various times, not compliant with his medication.

It is simply not clear to the Court that, based on the record before it, McLane and Marsh were aware not only of his disability but its consequential limitations. There is also no evidence in the record supporting Plaintiff's allegation that his mental illness is the cause of his frequent rule violations. The Court is not persuaded that there is enough in the record before it to create a genuine issue of material fact for trial. This claim is therefore denied.

9. Remaining Federal and State Claims

*Regulatory taking*

Plaintiff argues McLane "does by policy effect a regulatory taking of Welsh's property in violation of the Taking Clause of the Fifth Amendment." (ECF No. 47 at 5) (errors in original). Nowhere else in his pleadings does Plaintiff supply any factual allegations to support this claim. It is therefore dismissed as conclusory. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim for relief).

*State-created liberty interest*

Plaintiff next argues McLane violated his procedural due process rights based on the state-created liberty interests found in various parts of the Texas Constitution. This claim also fails as a matter of law. The parts of the Texas Constitution to which Plaintiff refers deal with the right to make bail, the right to a jury trial, and the right to a civil jury trial. *See* TEX. CONST. art. I § 13, 15; art. V § 10. None of these are relevant to Plaintiff's civil commitment.

*Texas Tort Claims Act*

Plaintiff next argues that TCCO, via its agents Defendants Peralta, Heredia, and Clum, are liable under the Texas Tort Claims Act (TTCA) for the negligent installation of his GPS ankle monitor, which caused him severe pain due to open wounds and bleeding. The Court discussed the allegations above and found the only evidence in the summary judgment record related to Plaintiff's ankle concluded he had a closed abrasion that required no treatment. Further, there is no evidence in the record suggesting either Heredia or Clum installed an ankle monitor on Plaintiff. Again, this claim is conclusory and is denied.

*Failure to protect*

Plaintiff next argues that Greenwalt failed to protect him during an incident that occurred on September 15, 2020. Defendants argue this claim is barred by the statute of limitations.

The statute of limitations for a § 1983 claim is determined by the forum state's limitations period for personal injury torts. *Wallace v. Kato*, 549 U.S. 384, 387 (2007). In Texas, that is two years from the date the cause of action accrues. TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a); *Schaefer v. Gulf Coast Reg'l Blood Ctr.*, 10 F.3d 327, 331 (5th Cir. 1994). Federal law determines when a § 1983 cause of action accrues. *Gartrell v. Gaylor*, 981 F.2d 254, 257 (5th Cir. 1993). Under federal law, a cause of action under § 1983 accrues when the aggrieved party knows, or has

reason to know of, the injury or damages which form the basis of the action. *Piotrowski v. City of Houston*, 51 F.3d 512, 516 (5th Cir. 1995).

Plaintiff knew of this claim on September 15, 2020, which is when he alleges he was attacked. The claim accrued then and therefore needed to be filed on or before September 15, 2022. Plaintiff filed his original complaint on August 18, 2023, approximately 11 months after the limitations period expired. Accordingly, this claim is dismissed as barred by the statute of limitations.

*Contacts policy is vague*

Plaintiff argues McLane has violated his right to live under a rule that is not vague because the Contacts Policy does not provide fair warning to Plaintiff that his mother and family members could be removed from his contact list.

Claims of unconstitutional vagueness are generally directed at criminal statutes, when criminal defendants argue the conduct described is not sufficiently specific to support a criminal conviction. "Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment." *United States v. Williams*, 553 U.S. 285, 304 (2008). Accordingly, "[a] conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that is authorizes or encourages seriously discriminatory enforcement." *Id.* (citation omitted). The vagueness doctrine does not apply to the Contacts Policy and thus this claim fails as a matter of law.

*GPS ankle monitor as badge of slavery*

Plaintiff claims his GPS ankle monitor constitutes a badge of slavery in violation of the Thirteenth Amendment. The Thirteenth Amendment provides that:

> Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

U.S. CONST. AMEND. XIII. "To prove a claim of involuntary servitude, an employee must show that there was no conceivable means of avoiding the continued service or confinement." *Burger v. Mil. Sea Lift Command*, 189 F.3d 467, 1999 WL 511534, at *2 (5th Cir. 1999) (unpublished, per curiam). Plaintiff's allegations do not amount to involuntary servitude. This claim therefore fails as a matter of law.

10. Qualified Immunity

Defendants assert their entitlement to qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*.

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Brown*, 623 F.3d at 253. "An officer merits qualified immunity unless (1) he 'violated a statutory or constitutional right of the plaintiff' and (2) 'the right was clearly established at the time of the violation.'" *Wilson v. City of Bastrop*, 26 F.4th 709, 712 (5th Cir. 2022) (quoting *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020)). When considering a qualified immunity defense, the Court still

views the evidence in the light most favorable to the non-movant and draws all inferences in the non-movant's favor, *see Rosado v. Deters*, 5 F.3d 119, 122-23 (5th Cir. 1993), and cannot make credibility determinations or weigh the evidence, *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

"In determining whether an officer is entitled to qualified immunity, courts engage in a two-step inquiry." *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) (citing *Tolan v. Cotton*, 572 U.S. 650 (2014)). "The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right[.]'" *Tolan*, 572 U.S. at 655-56 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second "asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 656 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

"For a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Atkins v. Hopkins*, 137 F.4th 286, 289 (5th Cir. 2025) (quoting *Shepherd v. City of Shreveport*, 920 F.3d 278, 285 (5th Cir. 2019)). Established rights cannot be defined "at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam). "The dispositive question is 'whether the violative nature of particular conduct is clearly established.'" *Atkins*, 137 F.4th at 289 (quoting *Mullenix*, 577 U.S. at 12).

"'[Q]ualified immunity represents the norm,' and courts should deny a defendant immunity only in rare circumstances." *Angulo v. Brown*, 978 F.3d 942, 949 (5th Cir. 2020) (quoting *Romero v. City of Grapevine*, 888 F.3d 170, 175 (5th Cir. 2018)).

Defendants are entitled to qualified immunity on all of Plaintiff's constitutional challenges. First, the Court only found constitutional violations in the following claims: (1) McLane's disciplinary policies violated Plaintiff's substantive due process rights by having him in reside in

the SMU for long periods of time with restrictive conditions of confinement; (2) McLane's policy of not requiring any procedural protections prior to reducing Plaintiff's treatment tier violates his right to procedural due process; (3) McLane's policy of removing Plaintiff's contacts without any procedural protections violates his right to procedural due process; (4) McLane's prohibition of all contact between Plaintiff and his mother violates his First Amendment right to freedom of association; and (5) Greenwalt and Peralta retaliated against Plaintiff for bonding out of Lamb County Jail by removing all his contacts. Defendants are entitled to qualified immunity on these claims if Plaintiff fails to show that his rights were clearly established at the time of the alleged violations.

Plaintiff's rights to procedural due process regarding a reduction of his treatment tier and the removal of contacts were not clearly established at the time of his violations. These rights have only recently been recognized by this Court. The Court also concludes Plaintiff's constitutional rights related to his confinement in the SMU were not clearly established at the time of the alleged incidents. Plaintiff points to no Supreme Court or Fifth Circuit authority discussing the substantive due process rights of SVPs regarding the length of time they can be held in solitary confinement. As a result, he fails to meet his burden to rebut the Defendants' entitlement to qualified immunity.

Regarding his retaliation claim, Plaintiff argues he has a constitutional right to post bail. This is not the precise question, however. The question is whether it was clearly established in July 2023 that it was unconstitutional for Greenwalt and Peralta to remove Plaintiff's contacts if he bonded out of Lamb County Jail. Plaintiff does not provide any case that addresses this issue.

In this Fifth Circuit, it is "clearly established ... that a prison official may not retaliate against or harass an inmate for exercising the right of access to the courts, or for complaining to a supervisor about a guard's misconduct." *Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir. 1995).

While it might seem intuitive that a civil commitment case manager cannot retaliate against a client for bonding out of jail, qualified immunity requires that "existing precedent must have placed the statutory or constitutional question beyond debate." *Atkins*, 137 F.4th at 289. It cannot be said that this particular issue was clearly established on July 1, 2023; therefore, Defendants Greenwalt and Peralta are entitled to qualified immunity.[9]

Finally, there is a genuine issue of material fact whether McLane's alleged prohibition of all contact between Plaintiff and his mother violates his First Amendment right to freedom of association. As previously noted, "freedom of association is among the rights least compatible with incarceration." *Overton*, 539 U.S. at 131. Further, in *Dunsmore v. McLane*, No. 21-50541, 2022 WL 3210681, at *2 (5th Cir. 2022), the Fifth Circuit held that, as it related to approving contacts for SVPs, "[r]estricting contact according to treatment objectives is rationally related" to the State's goals of treatment and supervision. Although the *Dusnmore* case is a non-precedential unpublished per curiam opinion, combined with *Overton*, it suggests any right to familial association was not clearly established at the time McLane prohibited Plaintiff from contacting his mother. Accordingly, McLane is also entitled to qualified immunity on this claim.

11. Plaintiff's Pending Motions

Finally, Plaintiff has two pending motions before the Court: a Motion for Additional Discovery (ECF No. 107) and a Motion for the Appointment of Expert to Assist the Court (ECF No. 122).

Under Federal Rule of Evidence 706, "[o]n a party's motion or on its own, the court may order the parties to show cause why expert witnesses should not be appointed and may ask the parties to submit nominations." FED. R. EVID. 706(a). "The court may appoint any expert that the

---

[9] Plaintiff only seeks monetary damages for this claim. Accordingly, because Greenwalt and Peralta are entitled to qualified immunity and Plaintiff seeks no equitable relief, this claim is dismissed.

parties agree on and any of its own choosing. But the court may only appoint someone who consents to act." *Id*. Rule 706 "allows the court to appoint an expert to assist in its own understanding of the issues, but not for the sole benefit of a party." *Borden v. United States*, 537 F. App'x 570, 575-76 (5th Cir. 2013). Plaintiff requests the appointment of an expert to assist the Court with his *Youngberg* claim, his medical care claim, and his ADA claim. The Court denied Plaintiff's medical care and ADA claims. It is unclear to the Court what Plaintiff means by his *Youngberg* claim. Nonetheless, at this point in the litigation, the Court denies this motion as unnecessary.

In Plaintiff's motion for additional discovery, he requests additional discovery in order to oppose Defendants' motion for summary judgment. The Court ordered Plaintiff to respond to Defendants' summary judgment motion, in which they asserted their entitlement to qualified immunity, prior to ruling on his discovery motion.

The Court has now concluded that Defendants are entitled to qualified immunity and denied the majority of Plaintiff's claims. The Court therefore denies Plaintiff's motion for additional discovery.

It is therefore **ORDERED** that Plaintiff's Motions for Appointment of an Expert and Additional Discovery (ECF Nos. 107, 122) are **DENIED**.

It is further **ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 103) is **GRANTED IN PART AND DENIED IN PART**. Defendants' motion is **GRANTED** with respect to their entitlement to qualified immunity as to any claims seeking monetary damages against them in their individual capacities. Defendants' motion is further **GRANTED** with respect to Plaintiff's claims seeking equitable relief, but **DENIED** with respect to the following claims:

1. McLane's disciplinary policies violated Plaintiff's substantive due process rights by placing in reside in the SMU for long periods of time with restrictive conditions of confinement.

2. McLane's policy of not requiring any procedural protections prior to reducing Plaintiff's treatment tier violates his right to procedural due process.

3. McLane's policy of removing Plaintiff's contacts without any procedural protections violates his right to procedural due process.

4. McLane's prohibition of all contact between Plaintiff and his mother violates his First Amendment right to freedom of association.

It is finally **ORDERED** that Plaintiff must pay the sanction imposed by the Fifth Circuit Court of Appeals in *Welsh v. Williams*, No. 24-11108 (5th Cir. Aug. 7, 2026) prior to filing any further pleadings in this case.

SIGNED this 18th day of August, 2026.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE